J-A27014-25
J-A27015-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| CHAUNCY STARLING | : | |
| | : | |
| Appellant | : | No. 81 EDA 2025 |

Appeal from the Judgment of Sentence Entered October 2, 2024
In the Court of Common Pleas of Delaware County Criminal Division at
No(s):  CP-23-CR-0004448-2017

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| Appellant | : | |
| | : | |
| v. | : | |
| | : | |
| CHAUNCY STARLING | : | No. 80 EDA 2025 |

Appeal from the Judgment of Sentence Entered October 2, 2024
In the Court of Common Pleas of Delaware County Criminal Division at
No(s):  CP-23-CR-0004448-2017

BEFORE:  BOWES, J., MURRAY, J., and BECK, J.

MEMORANDUM BY BOWES, J.:                    **FILED JANUARY 21, 2026**

Chauncy Starling ("Defendant") and the Commonwealth have cross-appealed from the judgment of sentence of probation, which was imposed upon Defendant following his nonjury conviction for attempted murder, aggravated assault, possession of an instrument of crime ("PIC") and carrying a firearm without a license.  We affirm in part and reverse in part.  In

particular, we affirm Defendant's convictions for PIC and carrying a firearm without a license, but vacate the judgment of sentence and reverse the convictions for aggravated assault and attempted murder. Since this disposition upsets the overall sentencing scheme, we vacate the remainder of the judgment of sentence and remand for resentencing on the weapons-related offenses.

We glean the following from the certified record. On April 7, 2001, police responded to a shooting in Chester, Delaware County, Pennsylvania, at around 11:45 p.m. Upon arriving at the scene, they observed a Toyota 4 Runner with the driver's door open and Alfred Gaines, face bloodied, lying in the street behind the car and unsuccessfully trying to stand up. He was emergently transported to the hospital and treated for gunshot wounds to his face, head, and neck. Gaines survived, but the shooting rendered him comatose for three days and caused him to lose his left eye. As summarized by the trial court, Gaines reported the following to the police:

> [O]n April 7, 2001[,] his longtime friend, Defendant . . . called him and they arranged to go out. When they met, Defendant . . . said they were going to meet up with two other individuals, Matthew Minor and Richard Frink and go see some strippers in Chester, PA. Defendant . . . got into a green Dodge Intrepid with Matthew Minor. Richard Frink and . . . Gaines got into the Toyota 4 Runner, and they followed Defendant . . . and Matthew Minor to Chester. While driving, . . . Gaines heard Richard Frink speaking on a phone with Matthew Minor. They stopped at 2[n]d and Flower Streets in Chester. Matthew Minor and Defendant . . . exited the Intrepid, and Defendant . . . walked to the rear of the Toyota. At the same time, before exiting the Toyota, Richard Frink told . . . Gaines he loved him. Defendant . . . then came from behind the Toyota and

fired his gun. . . . Gaines stated he remembered hearing two shots and being struck in the left eye and head.

Trial Court Opinion, 4/3/25, at 3 (nicknames omitted). When asked if he knew why Defendant had shot him, Gaines initially told law enforcement he did not know. *See* N.T. Trial, 3/21/24, at 53.

Based on the foregoing, Delaware County police filed a criminal complaint against Defendant on April 18, 2001 ("Gaines shooting"), and he was arrested that same day on those charges in the state of Delaware. Defendant waived extradition on April 19, and the Commonwealth had ten days to retrieve him. During that period, the state of Delaware charged Defendant for his involvement in a double homicide that had occurred before the Gaines shooting. As explained by the trial court:

A few weeks before [the Gaines shooting], on March 9, 2001[,] Damon Gist, a [five]-year-old boy, and Darnell Evans were shot and killed at the Made-4-Men barbershop ("Barbershop Shootings") in Wilmington, Delaware. During the weeks following the notorious Barbershop Shootings, police investigation discovered . . . Gaines, who allegedly was a witness in the Wilmington, Delaware Barbershop Shootings and allegedly identified Defendant as the gunman. On April 27, 2001, before police in Pennsylvania [picked up] Defendant [for the Gaines shooting], he was arrested in the state of Delaware for his involvement in the . . . Barbershop Shootings. As a result, in the years following, Defendant was confined in the state of Delaware working through the criminal case. On October 24, 2003[,] Defendant was convicted in the state of Delaware on two counts of murder in the first degree and related charges. On June 24, 2004[,] Defendant was sentenced to death for the murder convictions. On August 16, 2005, Defendant['s] death sentence was vacated. On October 2, 2005[,] Defendant was resentenced to death for the two counts of murder in the first degree. On December 14, 2015[,] following Defendant['s] appeal from an order denying [his] motion for post[-]conviction relief, the Delaware Supreme Court reversed and remanded [his]

- 3 -

> convictions and granted a new trial. In June 2017[,] Defendant pleaded *nolo contendere* to second degree murder and subsequently was released to Delaware County, P[ennsylvania]. According to counsel in this case, Defendant wanted to have another trial in the state of Delaware, but realizing this would result in additional jail time while he awaited the trial, he entered the *nolo contendere* plea as a matter of convenience.

Trial Court Opinion, 4/3/25, at 4-5 (Defendant's surname and unnecessary capitalization omitted).

Defendant was not formally arraigned on the Gaines shooting until June 28, 2017. The subsequent criminal information charged Defendant in relevant part with criminal attempt to commit homicide (count one), attempted first-degree murder (count two), attempted third-degree murder (count three), aggravated assault (count four), recklessly endangering another person ("REAP") (count five), PIC (count six), and carrying a firearm without a license (count eight).

Defendant filed a motion to dismiss based upon Pa.R.Crim.P. 600 and the constitutional right to a speedy trial on August 16, 2017. After conducting a hearing on November 6, 2017, the court denied the motion. Thereafter, upon Defendant's request, the court amended its order to allow Defendant to seek an interlocutory appeal of the Rule 600 issue. Defendant filed a petition for permission to appeal with this Court, which we denied on May 11, 2018. He sought further review by our High Court, which was also denied.

Following remand to the trial court, the assigned judge recused himself because he had served as the District Attorney of Delaware County during the interval when Defendant's prosecution was on hold pending resolution of the

Barbershop Shootings. Defendant asked the newly-assigned judge to rule upon the constitutional argument raised in his prior motion to dismiss, which he claims the original denial order did not address. After conducting a hearing, the court denied the constitutional portion of Defendant's speedy trial claim. Defendant filed multiple motions for reconsideration, which the court denied. The trial was then further delayed due, in part, to the COVID-19 pandemic.

On March 21, 2024, the court held a nonjury trial. Gaines testified that his initial hesitance in speaking to police about a motive was due to fear, but that he believed Defendant shot him because Gaines had knowledge of Defendant's part in the Barbershop Shootings that had transpired approximately one month before.[1] *Id*. at 40, 50, 60-61.

The parties waived the requirement that the court issue a verdict within seven days. *See* Pa.R.Crim.P. 622(A) ("A verdict shall be rendered in all non-jury cases within [seven] days after trial."). Approximately one month later, on April 24, the court announced its verdict. In relevant part, it declared Defendant not guilty of attempted homicide or first-degree murder, but guilty of criminal attempt to commit third-degree murder, PIC, and carrying a firearm without a license.[2] It also stated that Defendant was not guilty of aggravated assault or REAP because they merged with the attempted murder

_____

[1] Although not explicitly stated by Gaines, it is evident that he was referring to the Barbershop Shootings.

[2] While the court utilized count numbers instead of offense names in announcing much of its verdict, we have no difficulty in connecting the counts to the charges on the criminal information.

- 5 -

conviction. The parties then discussed a sentencing schedule with the court and the preparation of a pre-sentence investigation ("PSI") report.

The proceedings ended at 9:34 a.m., but then resumed at 9:41 a.m., without explanation for the break. Once the parties were back on the record, and notwithstanding the fact that the Commonwealth had charged Defendant with the crime and argued for his conviction of same, the Commonwealth orally moved to vacate the verdict because an attempted murder can only refer to an attempt to commit first-degree murder. As just detailed, the court had adjudged Defendant guilty of attempt to commit third-degree murder. The court agreed with the Commonwealth and deferred the matter to a future date. Defendant's counsel lodged no objection and indicated that he would be available for the entry of a new verdict on May 9, 2024.

At the May court date, however, Defendant sought a continuance to be able "to submit a memorandum in reference to what occurred the last time we were in court." N.T. Hearing, 5/9/24, at 4. The Commonwealth asked that the court ignore the request and enter a verdict, alluding to its "belie[f that] counsel is raising double jeopardy issues[.]" *Id*. at 5. The court continued the matter and both Defendant and the Commonwealth submitted briefs regarding the rendering of a new verdict, at which point Defendant first raised a double jeopardy challenge as such.[3]

_____

[3] We note that Defendant's brief appears in the reproduced record but was not included in the certified record. *See Pierce v. FloatMe Corp.*, ___ A.3d *(Footnote Continued Next Page)*

Ultimately, on July 10, 2024, the court found Defendant guilty of criminal attempt to commit murder of the first degree, aggravated assault, PIC, and carrying a firearm without a license.

Following a hearing in September 2024, the court imposed an aggregate sentence of ten years of probation. The Commonwealth filed a motion for reconsideration, alleging that the sentence was excessively lenient and because the crimes of aggravated assault and attempted murder merged for sentencing purposes. The court granted the motion in light of the merger and, on October 2, 2024, resentenced Defendant to ten years of probation for attempted murder, and five years of probation for each weapons-related offense. All probationary terms were set to run concurrently.

The Commonwealth again filed a motion for reconsideration, claiming that the sentence was "significantly below the sentencing guidelines" and that the court abused its discretion in how it weighed the aggravating and mitigating factors. *See* Motion to Modify Sentence, 10/14/24, at 2-3.[4] According to the Commonwealth, the probationary sentence "was an unjustified excessively lenient sentence for a man who attempted to kill a

_____

___, 2025 WL 3076233, at *6 (Pa.Super. 2025) (observing that while appellate courts are limited to reviewing facts duly certified, the note to Pa.R.A.P. 1921 allows us to consider documents in the reproduced record but not transmitted as part of the certified record if their accuracy is undisputed).

[4] The Commonwealth's motion was timely because the tenth day fell on a Saturday. *See* 1 Pa.C.S. § 1908 ("Whenever the last day of any such period shall fall on Saturday or Sunday . . . such day shall be omitted from the computation.").

witness against him in another criminal proceeding." *Id*. at 3. The court denied the motion.

The Commonwealth timely filed the instant appeal, and Defendant properly cross-appealed. The Commonwealth and Defendant both complied with the court's order to file a concise statement of errors pursuant to Pa.R.A.P. 1925(b).[5] In response, the court authored a single Rule 1925(a) opinion addressing the issues to be raised in the cross-appeals. The Commonwealth presents a single issue for our consideration:

> Did the lower court abuse its discretion when it dramatically deviated from even the mitigated sentencing range by imposing only probation for attempted murder, and in doing so focused entirely on [D]efendant's prior incarceration and mental health needs to the exclusion of the gravity of the offense and the protection of the public?

Commonwealth's brief at 3.

Defendant, meanwhile, presents three questions:

1. Did the trial court err and abuse its discretion in denying [Defendant]'s motion to dismiss based on a violation of Pa.R.Crim.P. 600 where the Commonwealth failed to prove that it exercised due diligence throughout the [sixteen] years between the date that the criminal complaint and warrant were filed and the date that the prosecution returned [Defendant] to Pennsylvania for trial?

2. Did the trial court err and abuse its discretion in denying [Defendant]'s motion to dismiss based on a violation of [Defendant]'s speedy trial rights as guaranteed by the Sixth

---

[5] We remind the trial court that all Rule 1925(b) orders must provide "the address to which the appellant can mail the Statement." Pa.R.A.P. 1925(b)(3)(iii).

and Fourteenth Amendments of the United States Constitution and Article I, § 9 of the Pennsylvania Constitution?

3. After a non-jury trial, where the trial court entered its verdict on the record in open court, as recorded in the transcript of that proceeding, and acquitted [Defendant] of, among other things, criminal attempt-first degree murder and aggravated assault, and found him guilty of, among other things, criminal attempt-third degree murder, did the trial court err and infringe [Defendant]'s right not to be placed in double jeopardy, as guaranteed by the Fifth and Fourteenth Amendments of the United States Constitution and Article I, § 10 of the Pennsylvania Constitution when it changed its on-the-record decision to acquit [Defendant] of criminal attempt-first degree murder and aggravated assault from not guilty to guilty?

Defendant's brief at 5-6 (cleaned up).

Since granting relief on Defendant's Rule 600 claim would dismiss all charges and end the case, we begin with that issue.

## Rule 600

Defendant attacks the order denying his pre-trial motion to dismiss pursuant to Rule 600 and the constitutional right to a speedy trial. We start with the Rule 600 portion of that motion. At bottom, Defendant argues that the court's finding that the Commonwealth acted with due diligence in bringing him to trial is not supported by the record. *See* Defendant's (appellant) brief at 26. This argument is two-fold: (1) the Commonwealth failed to timely retrieve him from the state of Delaware after he waived extradition, and (2) the Commonwealth did not utilize the available means to prosecute him notwithstanding the pending Barbershop Shootings case. *Id*. at 26-27. He avers that the Commonwealth offered no evidence to explain why it did not drive seventeen miles across the state border to secure Defendant's custody

in the nine days between his waiver of extradition and Delaware charging him with the Barbershop Shootings. *Id*. at 31.

Second, he assails the court's conclusion that the Commonwealth maintained contact with Delaware between 2001 and 2017, insisting that "the [r]ecord does not demonstrate that the minimal and ineffective contact that existed established that the Commonwealth acted with due diligence[,]" particularly where it did not "diligently implement the processes available through either the [Uniform Criminal Extradition Act ("UCEA")[6]] or the [Interstate Agreement on Detainers ("IAD")[7]]." *Id*. at 32. He contends that

_____

[6] The UCEA is codified at 42 Pa.C.S. §§ 9121-9148. Section 9126 provides, in pertinent part:

> **(a) Extradition from another state.--**When it is desired to have returned to this Commonwealth a person charged in this Commonwealth with a crime, and such person is imprisoned or is held under criminal proceedings then pending against him in another state, the Governor of this Commonwealth may agree with the executive authority of such other state for the extradition of such person before the conclusion of such proceedings or his term of sentence in such other state, upon condition that such person be returned to such other state at the expense of this Commonwealth as soon as the prosecution in this Commonwealth is terminated.

42 Pa.C.S. § 9126.

[7] The IAD, as enacted into law by this Commonwealth, is memorialized at 42 Pa.C.S. § 9101. We have explained:

> The IAD is an agreement between forty-eight states, the District of Columbia, Puerto Rico, the Virgin Islands, and the United States, that establishes procedures for the transfer of prisoners

*(Footnote Continued Next Page)*

the Commonwealth's IAD request was premature before he was serving a sentence for the Barbershop Shootings, and that it should have instead invoked the UCEA to secure his return for a timely trial on the Gaines shooting. *Id*. at 35-36. Furthermore, Defendant posits that the Commonwealth could not have acted diligently where it failed to demand extradition via the UCEA between 2015 and 2017, when the Barbershop Shootings case was remanded for a new trial. *Id*. at 46-47.

In regards to the IAD, Defendant argues that although the Commonwealth properly submitted an IAD request in 2004 after he was sentenced to death, it did not follow up when Delaware failed to respond. Moreover, he avers that any contention that he was not subject to the IAD because of his death sentence necessarily fails because that pronouncement did not preclude application of the IAD and, if it did, his death sentence was

_____

> incarcerated in one jurisdiction to the temporary custody of another jurisdiction which has lodged a detainer against a prisoner. Unlike a request for extradition, which is a request that the state in which the prisoner is incarcerated transfer custody to the requesting state, a detainer is merely a means of informing the custodial jurisdiction that there are outstanding charges pending in another jurisdiction and a request to hold the prisoner for the requesting state or notify the requesting state of the prisoner's imminent release. The IAD is remedial legislation intended to curb previous abuses and alleviate problems associated with prisoners' uncertainty resulting from unresolved charges pending in another jurisdiction.

*Commonwealth v. Montione*, 720 A.2d 738, 740 (Pa. 1998) (cleaned up).

stayed during the pendency of his Barbershop Shootings appeals. *Id*. at 38-42.

With this background in mind, we set forth the relevant legal principles. Critically, this Court reviews orders ruling upon a Rule 600 motion for abuse of discretion. *See Commonwealth v. Graves*, 328 A.3d 1005, 1008 (Pa.Super. 2024). Further:

> [O]ur scope of review is limited to the trial court's findings and the evidence on the record, viewed in the light most favorable to the prevailing party. An abuse of discretion is not merely an error of judgment, but if in reaching a conclusion the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will, discretion is abused.

*Id*. (cleaned up).

Turning to the rule itself, Rule 600(A) provides that a defendant shall be brought to trial "within 365 days from the date on which the complaint is filed." Pa.R.Crim.P. 600(A)(2)(a) (effective July 1, 2013 to December 31, 2023). "[P]eriods of delay at any stage of the proceedings caused by the Commonwealth when the Commonwealth has failed to exercise due diligence shall be included in the computation of the time within which trial must commence. Any other periods of delay shall be excluded from the computation." Pa.R.Crim.P. 600(C)(1).

Our Supreme Court has clarified that "in ruling on a defendant's Rule 600 motion to dismiss, a trial court must first determine whether the Commonwealth has met its obligation to act with due diligence throughout the

life of the case[.]" ***Commonwealth v. Harth***, 252 A.3d 600, 618 (Pa. 2021). "It is the Commonwealth's burden to demonstrate due diligence by a preponderance of the evidence to avail itself of an exclusion under Rule 600." ***Graves***, 328 A.3d at 1009 (cleaned up). "Due diligence is a fact-specific concept that must be determined on a case-by-case basis. Due diligence does not require perfect vigilance and punctilious care, but rather a showing by the Commonwealth that a reasonable effort has been put forth." ***Commonwealth v. Wiggins***, 248 A.3d 1285, 1289 (Pa.Super. 2021) (cleaned up). It "includes, *inter alia*, listing a case for trial prior to the run date, preparedness for trial within the run date, and keeping adequate records to ensure compliance with Rule 600." ***Commonwealth v. Moore***, 214 A.3d 244, 249 (Pa.Super. 2019) (cleaned up).

As it relates to the particular circumstances of this case, we reiterate the well-settled tenet "that mere incarceration in another state does not make a defendant unavailable within the meaning of Rule 600." ***Commonwealth v. Booze***, 947 A.2d 1287, 1291 (Pa.Super. 2008). "A defendant is only unavailable if the delay in returning him to Pennsylvania is due to the other state causing the delay; the prosecution, however, must exercise due diligence in attempting to bring the defendant back for trial." ***Id***. (cleaned up). We have held that "the Commonwealth should at least **initiate** extradition proceedings within 365 days from the filing of the complaint for defendants who are imprisoned in another state in order to meet its duty as to due diligence." ***Id***. at 1292 (emphasis in original). However, the IAD "does

not require a filing of formal detainers until a term of imprisonment has been imposed in the asylum state." **Id**. Finally, "matters of availability and due diligence must be judged by what **was** done by the authorities rather than by what was not done." **McNear**, 852 A.2d at 406 (cleaned up, emphasis in original).

As a reminder, Defendant was arrested for the Gaines shooting in the state of Delaware on April 18, 2001. He was lodged as a fugitive and waived extradition to Pennsylvania the following day. Delaware advised Delaware County to pick him up within ten days of that waiver. On April 27, prior to the expiration of that period and before Delaware County acquired custody of Defendant, the state of Delaware charged Defendant with the Barbershop Shootings. Thus, his status was altered from that of a Pennsylvania fugitive awaiting extradition for the Gaines shooting to an individual anticipating trial on charges for Delaware crimes, namely, the Barbershop Shootings.

On December 3, 2001, before Defendant stood trial or was sentenced on the Barbershop Shootings case, the Commonwealth sent to Delaware an IAD request for temporary custody of Defendant. Delaware did not accept the request.

Defendant proceeded to trial in Delaware for the Barbershop Shootings on October 15, 2003, and was condemned to death on June 10, 2004. On July 12, 2004, the Commonwealth again sent a request for temporary custody of Defendant pursuant to the IAD. Once more, nothing happened. The

subsequent Rule 600 hearing, detailed below, bore out that Delaware officials chose not to send Defendant to Pennsylvania because he was on death row.

Thereafter, the Delaware Supreme Court overturned Defendant's convictions on December 14, 2015. Four days later, the Commonwealth asked that their warrant for the Gaines shooting be lodged as a detainer, independent of the IAD, because Defendant was again awaiting trial for the Barbershop Shootings. The state of Delaware lodged that detainer on December 21.

Defendant pled no contest to second-degree murder in the Barbershop Shootings on February 10, 2017, and was sentenced on March 24, 2017, to eighteen years of incarceration. Pursuant to the IAD, the Commonwealth requested temporary custody on April 6, 2017, which it finally received on June 13, 2017. The Commonwealth held Defendant's preliminary conference in the matter *sub judice* on July 19, 2017. Formal arraignment followed on August 16, 2017, the same day Defendant filed his motion to dismiss.

At the Rule 600 hearing, Rebecca McBride of the Delaware Department of Corrections ("DDOC") confirmed the aforementioned timeline. She relayed that on March 15, 2002, the DDOC advised Delaware County that Defendant was on trial for a double homicide and that the DDOC would contact Delaware County once the charges reached disposition. **See** N.T. Rule 600 Hearing, 11/6/17, at 47. She further explained that the 2004 IAD request was the first one that the DDOC had received for an inmate on death row and the DDOC was reluctant to transfer Defendant out of their facility. Ultimately, it was

- 15 -

decided that an official would notify Delaware County that the DDOC would not honor the request. *Id*. at 44-45. She summarized that despite Pennsylvania asking for custody of Defendant several times before his sentence was overturned, Delaware "was unable to do so at the time." *Id*. at 78.

Daniel J. McDevitt, Esquire, Deputy District Attorney ("DDA") for Delaware County, testified that he sought extradition of Defendant from Delaware via the UCEA on April 18, 2001. However, when murder charges were filed against him by the state of Delaware, Defendant became "unavailable to the State of Pennsylvania." *Id*. at 83. DDA McDevitt explained that the Gaines shooting would become a capital murder case if Gaines succumbed to his wounds because he was a witness in the Barbershop Shootings, and therefore he followed Defendant's two cases closely. For the same reason, he sent an IAD request to Delaware in December of 2001 so that Defendant could be returned to Pennsylvania once the Barbershop Shootings case was resolved and a term of imprisonment was imposed. *Id*. at 84, 88.

As detailed, the case initially resolved with Defendant being condemned to death. Although DDA McDevitt did not believe the IAD applied to death sentences because they are not terms of imprisonment but a pronouncement to end Defendant's life, he nonetheless filed another IAD request approximately one month after Defendant was sentenced in case any appeals resulted in his sentence being changed to one of incarceration, such that he

could then be transferred via the IAD to Pennsylvania to stand trial on the Gaines shooting. *Id*. at 88-89. As expected, Delaware did not grant temporary custody to Pennsylvania while Defendant was condemned to death for the Barbershop Shootings.

Nevertheless, once Defendant's sentence was overturned and he was again awaiting trial in Delaware for the Barbershop Shootings, DDA McDevitt demanded extradition pursuant to the UCEA. *Id*. at 90-91. Then, following Defendant's new sentence of imprisonment, Pennsylvania finally obtained Defendant's custody through another IAD request. *Id*. at 95-96.

In denying Defendant's motion to dismiss, the trial court credited the Commonwealth's efforts to secure his extradition and found the evidence clear that Delaware had no intention of releasing Defendant to be tried for the Gaines shooting while his trial for the Barbershop Shootings was pending or while he was condemned to death. *See* Order, 1/16/18, at 10. Analogizing the case to *McNear*, the court held that the Commonwealth proved it exercised due diligence in attempting to have Defendant transported to Pennsylvania for prosecution of the Gaines shooting. Therefore, for Rule 600 purposes, it excluded the time between April 19, 2001 and June 13, 2017, and determined that he was tried within 365 days as required by the Rule. *Id*. at 10-11.

Contrarily, Defendant likens his circumstances to those present in this Court's decision in *Commonwealth v. Morgan*, 239 A.3d 1132 (Pa.Super. 2020), wherein we concluded that the Commonwealth did not exercise due

diligence in securing extradition of a defendant incarcerated in Georgia. *See* Defendant's (appellant) brief at 29. Upon review, we conclude that the trial court's findings are supported by the record, and we discern no abuse of discretion in its determination that the Commonwealth acted with due diligence in trying to secure Defendant's return to Pennsylvania to stand trial for the Gaines shooting. Moreover, we agree with the trial court that the facts underlying this case align more with *McNear* than *Morgan*.

In *McNear*, the defendant was charged in November 2000, for crimes in Pennsylvania, and he was discovered to be serving a sentence of incarceration in New Jersey in December 2000. The Commonwealth reached out to New Jersey authorities, who explained that McNear would be available for extradition after he completed his New Jersey sentences of incarceration, which expired in June 2002. Pennsylvania immediately obtained custody of McNear thereafter and he filed a motion to dismiss pursuant to Rule 600. In later appealing the denial of that motion, McNear argued that the Commonwealth did not prove it acted diligently between 2000 and 2002 because it did not seek extradition pursuant to the IAD or UCEA. We disagreed, observing that "in view of the fact that the New Jersey authorities opposed extradition, the Commonwealth was not necessarily compelled to proceed under either the IAD or the UCEA, where to do so would no doubt have been fruitless." *McNear*, 852 A.2d at 407.

In *Morgan*, the Commonwealth filed escape charges against the defendant in October 2008. Later that month, it learned that Morgan was

incarcerated in Georgia pending a murder trial. The Commonwealth asked that a detainer be placed on Morgan. Georgia authorities advised the Commonwealth that they would notify the Commonwealth once the Georgia murder trial was resolved, but that if he received a sentence of incarceration, the Commonwealth would need to re-initiate extradition proceedings. Morgan was convicted and sentenced in Georgia in 2010, but Georgia failed to advise the Commonwealth of the resolution. The Commonwealth did not contact Georgia until 2012. At that time, it learned of Morgan's sentence in Georgia and asked that the Pennsylvania warrant be lodged against him. Again, Georgia did not respond. Instead of following up on the request, the Commonwealth took no action for six years, and then in 2018 requested another detainer. Georgia released Morgan to Pennsylvania a few months later when his term of incarceration expired.

Morgan filed a pre-trial motion to dismiss based upon the Commonwealth failing to act diligently in effectuating his extradition, which the trial court denied and we reversed on appeal. We distinguished **McNear** because "[t]he holding in that case was grounded in the existence of clear communication from out-of-state officials indicating that it was unwilling to extradite the defendant" whereas in **Morgan**, no such communications existed and, in fact, the communications that did occur revealed that "the possibility of future extradition was explicitly left open[.]" **Morgan**, 239 A.3d at 1138-39. Importantly, we found "no indication in the certified record that [Georgia] was unwilling or unable to extradite [Morgan] to Pennsylvania[.]" **Id**. at 1139.

This Court emphasized that the Commonwealth waited two years after Morgan began serving his sentence of imprisonment in Georgia before attempting to initiate extradition proceedings and waited an additional six years before conducting any sort of follow-up. *Id*. at 1139-40. We held that the Commonwealth's inaction evidenced a lack of due diligence, and therefore the trial court erred in excluding these periods. Once these periods were properly included in the Rule 600 calculations, it was determined that the Commonwealth violated the Rule. Therefore, we vacated his judgment of sentence and reversed his conviction. *Id*. at 1141.

We acknowledge that the period of time that Defendant was deemed unavailable by the trial court is much longer than that at issue in either *McNear* or *Morgan*. However, as in *McNear* and unlike in *Morgan*, it was plain to the Commonwealth in the instant matter that the state of Delaware would not extradite Defendant while he was either awaiting trial for the homicides in the Barbershop Shootings, or while he was condemned to death for his involvement therein. Pursuant to those clear communications, the Commonwealth was not obligated to incessantly bang at Delaware's door with every type of extradition request at its disposal when it already knew that Delaware would not release Defendant.

Critically, any time there was a change in circumstances, the Commonwealth immediately sought extradition of Defendant from Delaware, ultimately securing it after his convictions were vacated and he was sentenced to a term of imprisonment. In other words, the Commonwealth did not sit on

its hands and wait for Delaware to act, as it did in *Morgan*. The Commonwealth was clearly invested in trying Defendant for the Gaines shooting. Thus, although it was an exceptionally long period of time before he was brought to trial in this Commonwealth, we find no abuse by the trial court in deeming Defendant unavailable for that entire period, and concluding that the Commonwealth acted diligently throughout in trying to secure Defendant's extradition to stand trial for the Gaines shooting.

Accordingly, Defendant is not entitled to relief on his Rule 600 claim.

**Speedy Trial**

Defendant similarly contends that his speedy trial rights guaranteed by the federal and state constitutions were violated. As with an order denying a Rule 600 motion, "our standard of review is whether the trial court abused its discretion, and our scope of review is limited to the trial court's findings and the evidence on the record, viewed in the light most favorable to the prevailing party." *Commonwealth v. Martz*, 232 A.3d 801, 812 (Pa.Super. 2020) (cleaned up). Even where the delay does not violate Rule 600, it may nonetheless violate the constitutional right to a speedy trial. We review such constitutional speedy trial claims mindful of the following:

> The Sixth Amendment to the United States Constitution and Article I, [§] 9 of the Pennsylvania Constitution guarantee a criminal defendant the right to a speedy trial. Pursuant to these constitutional guarantees, this Court will analyze and weigh, in accordance with the U.S. Supreme Court's speedy trial analysis established in *Barker v. Wingo*, 407 U.S. 514 (1972), the following four factors: (1) whether the pretrial delay was uncommonly long; (2) whether the government or the criminal

defendant is more to blame for that delay; (3) whether, in due course, the defendant asserted his right to a speedy trial; and (4) whether the defendant suffered prejudice because of the delay. A finding in the defendant's favor of any one of the four factors, standing alone, does not constitute a speedy trial violation. Rather, each of the four factors are related and each must be weighed carefully in the court's evaluation of a criminal defendant's claim that his speedy trial rights were violated.

***Commonwealth v. DeBlase***, 665 A.2d 427, 432 (Pa. 1995) (cleaned up).

Here, Defendant asked the trial court to reconsider his constitutional claim because he believed the prior judge denying his Rule 600 claim did not address this distinct issue. The trial court aptly articulated the unique circumstances surrounding the matter *sub judice* in denying Defendant's request to have the constitutional aspect of his motion to dismiss reconsidered:

> At the outset th[e trial] court notes the issue of the government's blame for any delay is settled as set forth plainly in the order denying the Rule 600 motion. To be clear, this is an extremely serious and complex interstate double murder and attempted murder case involving multiple co-defendants and witnesses to making out the various cases in different jurisdictions.
>
> The interest of the Commonwealth of Pennsylvania in prosecuting an attempted murder case is strong. Counter-balanced by the fact that an asylum jurisdiction, instantly the State of Delaware, shall generally retain the defendant until the proceedings and sentence on local charges there are carried out. Death penalty cases are associated with protracted appellate and collateral proceedings that can reasonably go on for decades. Here, apparently some chargeable prosecutorial misconduct in the State of Delaware surrounding . . . Defendant's confession in some manner ultimately [led] to [his] death penalty sentence being vacated.

> A [seventeen-]year delay is not considered prejudicial due to the complexity of this case. There was no evidence proffered on the record that the delay in the instant case is as alleged to be "presumptively prejudicial" under the circumstances present, that is, a death penalty case with its associated lengthy review and appellate procedures.

> Detectives from Chester, Delaware County testified in proceedings in the State of Delaware. Both prosecutors' offices communicated throughout the prosecution. Significantly, when Delaware County prosecutors sought . . . Defendant's co-defendant for prosecution, he was made available for retrieval. . . . Defendant was withheld from Delaware County prosecutors because the State of Delaware intended to and did proceed with prosecuting . . . Defendant.

> Also, . . . Defendant has failed to articulate how the delay has prejudiced his ability to defend himself against the charges here. Defendant did not cite any loss of witnesses or other evidence during the delay.

> Lastly, there was no affirmative evidence presented that . . . Defendant was asserting his speedy trial rights through the intervening period. In fact, the evidence appears to show [he] did not take earlier opportunities seeking a speedier trial and execute extradition forms.

Order, 3/11/19, at unnumbered 2-3 (cleaned up). Applying the **Barker** test to the foregoing, the trial court found that the Commonwealth did not violate Defendant's constitutional rights to a speedy trial.

It is undisputed that the delay in this case was extensive, which would weigh the first factor in Defendant's favor. However, the length of delay was premised upon Defendant's double homicide trial and capital conviction in another state, he has not demonstrated prejudice, and he did not assert his right to a speedy trial in the Gaines shooting until after he was finally extradited from Delaware.

Upon review, we hold that the trial court did not abuse its discretion in weighing the four factors and concluding that Defendant was not denied his right to a speedy trial under either the federal or Pennsylvania constitution. Thus, the constitutional portion of Defendant's speedy trial issue likewise garners him no relief.

**Double Jeopardy**

Defendant next argues that his convictions for attempted murder and aggravated assault should be reversed and vacated as violative of the prohibition against double jeopardy as set forth in the constitutions of the United States of America and the Commonwealth of Pennsylvania. *See* Defendant's (appellant) brief at 60. He cites *Commonwealth v. Chambers*, 310 A.3d 76 (Pa. 2024), as controlling the trial court's inability to amend its verdict where "[t]here was no mistake, clerical, or transcription error" and the court "expressed neither hesitation nor confusion with the verdict." *Id*. at 65 (cleaned up). Moreover, Defendant avers that the Commonwealth can claim no such error in the verdict when it both charged Defendant with attempted murder of the third degree and lobbied for the court to adjudge Defendant guilty of that offense following the bench trial. *Id*. at 66.

Defendant summarizes his argument as follows:

The trial court's announcement in open court of its verdict on April 24, 2024, was not ambiguous and was final. While authority exists for the trial court to set aside a conviction where the evidence was not sufficient to sustain the conviction or where, as here, the defendant was convicted for an offense not recognized under Pennsylvania law, no authority exits [*sic*] for the trial court

- 24 -

to vacate the acquittals on charges not called into question and change his verdict of "not guilty" to "guilty." In fact, the double jeopardy clauses of the constitutions of the United States and of Pennsylvania preclude the same.

*Id*. at 69 (cleaned up).

We begin with the principles guiding our review:

An appeal grounded in double jeopardy raises a question of constitutional law. This Court's scope of review in making a determination on a question of law is, as always, plenary. As with all questions of law, the appellate standard of review is *de novo*. To the extent that the factual findings of the trial court impact its double jeopardy ruling, we apply a more deferential standard of review to those findings.

*Commonwealth v. King*, 271 A.3d 437, 443 (Pa.Super. 2021) (cleaned up).[8]

A trial court has very limited authority to change a non-jury verdict once rendered:

Pursuant to Pa.R.Crim.P. 621, when a case proceeds non-jury the court must render a verdict which shall have the same force and effect as a verdict of a jury. Thus, **once announced in open court**, and certainly once entered upon the docket, the court's verdict was the same as if rendered by a jury. The fact that it was the court that reached the verdict did not make the verdict less firm than a jury verdict, nor did it make it malleable and capable of later revision by the court. Consequently, unless the verdict was flawed in some fashion that relegated it subject to attack, the court had no more power to change the verdict than it would have had in a jury trial.

_____

[8] We note that double jeopardy challenges often implicate the legality of one's sentence and are therefore non-waivable. *See Commonwealth v. Hill*, 238 A.3d 399, 407-08 (Pa. 2020). However, when the issue on appeal challenges the underlying conviction and not the sentence for that conviction, "the claim d[oes] not implicate the legality of [a] sentence for purposes of issue preservation." *Id*. at 409. Here, Defendant objected as soon as he learned that the court was changing his acquittals to convictions, thereby preserving his conviction-based double jeopardy challenge for appeal.

*Commonwealth v. Farinella*, 887 A.2d 273, 275 (Pa.Super. 2005) (cleaned up, emphasis added).[9]   Stated differently, a verdict is rendered once it is announced by the trial court on the record and in open court.  The recording of that verdict upon the docket serves that same purpose, but such recording is not necessary for the nonjury verdict to reach the same level of unassailability as a jury verdict.

Despite its finality, "a trial court can modify a verdict entered in error if it does so **immediately**."  *Chambers*, 310 A.3d at 90 (emphasis in original).  On the other hand, a verdict may be changed after the passage of some time only in rare circumstances.  *Id*.  Moreover, "the burden for justifying such an action is very high.  In extremely exceptional cases, a court can fix patent and obvious clerical errors, or an error that occurs when transcribing the verdict, but such cases must be approached with caution."  *Id*. (cleaned up).  Finally, the *Chambers* Court enunciated the sanctity of acquittals once rendered:

> [T]the Supreme Court of the United States has declared that perhaps the most fundamental rule in the history of double jeopardy jurisprudence has been that a verdict of acquittal could not be reviewed, on error or otherwise, without putting a defendant twice in jeopardy, and thereby violating the Constitution.  The fundamental nature of this rule is manifested by its explicit extension to situations where an acquittal is based upon an egregiously erroneous foundation.  In other words, the

---

[9] The Commonwealth makes much ado about the recording of the verdict on the docket for it to be considered a properly entered verdict.  *See* Commonwealth's brief at 26-27.  In light of the plain language in *Farinella*, and the fact that the Commonwealth does not even acknowledge it, we will not give the Commonwealth's restricted interpretation any further credence.

rule applies even when the acquittal patently and obviously was incorrect, or was contrary to the fact-finder's intentions. An acquittal is insulated from further review and necessarily is the definitive end of the prosecution for that charge. There can be no appeals or retrials on that charge. And, thus, it is axiomatic that one also cannot be sentenced on a crime for which he was acquitted.

*Id*. at 88 (cleaned up).

It bears repeating that the present matter is in a class by itself, both as it relates to the trial delay and in the rendering of the court's verdict. By way of further background, the trial court "announced in open court" its verdict on April 24, 2024. *See Farinella*, 887 A.2d at 275. Specifically, it adjudged Defendant not guilty of counts one and two, which indisputably corresponded with attempted homicide and attempted first-degree murder on the criminal information; guilty of count three, attempted murder of the third degree; and not guilty of count four or five, i.e., aggravated assault and REAP, because they merged with count three. *See* N.T. Hearing, 4/24/24, at 3-4; Criminal Information.

Pursuant to our jurisprudence, the April 24 verdict could not be disturbed "[u]nless the verdict was flawed in some fashion that relegated it subject to attack[.]" *Chambers*, 310 A.3d at 92. Here, the court vacated Defendant's conviction for attempted third-degree murder based upon this Court's decision in *Commonwealth v. Williams*, 730 A.2d 507, 511 (Pa.Super. 1999), wherein we held that such a crime is not cognizable under Pennsylvania law. *Id*. ("In an attempted murder case the lowering of the

- 27 -

degree is logically impossible. There simply is no such crime as attempted second[-] or third[-]degree murder.").

However, the **acquittal** of attempted first-degree murder had no such infirmity. Thus, while the court was permitted to amend the verdict to vacate the illegal conviction of attempted third-degree murder, it could not amend the verdict to find Appellant guilty of a different level of attempted murder of which he had been acquitted.

We reach the same conclusion as to aggravated assault. Certainly, it was unnecessary for the court to find Defendant not guilty of aggravated assault simply because it would merge with attempted murder **for sentencing purposes**. *See Commonwealth v. Anderson*, 650 A.2d 20, 24 n.4 (Pa. 1994), *decision modified on other grounds on denial of reargument*, 653 A.2d 615 (Pa. 1994) ("We recognize that merger may concern either sentences or offenses" but that "Pennsylvania law concerns the merger of sentences."). Notwithstanding this anomalous reasoning, the court unequivocally found him not guilty of aggravated assault on April 24. Though not the proper mechanism for handling merger, the court's verdict of not guilty was nonetheless legally proper otherwise. Apparently in July the court realized it could have convicted Defendant of both offenses and merely imposed a sentence as to one because it found him guilty of both attempted first-degree murder and aggravated assault. However, by that point, the court no longer had that option because it had already deemed Defendant not guilty of aggravated assault in April.

Based on the foregoing, we hold that the trial court ran afoul of Defendant's double jeopardy protections when it vacated, on the Commonwealth's motion, his acquittals for aggravated assault and attempted first-degree murder, and then subsequently convicted him of those offenses. Accordingly, we vacate the judgment of sentence as to attempted first-degree murder and aggravated assault, and reverse the corresponding convictions. In doing so, we have disturbed the overall sentencing scheme. *See Commonwealth v. Thur*, 906 A.2d 552, 569 (Pa.Super. 2006) ("If our disposition upsets the overall sentencing scheme of the trial court, we must remand so that the court can restructure its sentence plan." (cleaned up)). Thus, we also vacate the judgment of sentence of concurrent terms of five years of probation that Defendant received for his weapons-related offenses and remand for resentencing on those convictions.

### Commonwealth Appeal

Finally, in its appeal, the Commonwealth challenges the discretionary aspects of Defendant's sentence to ten years of probation for attempted first-degree murder. This claim is mooted by our disposition, which vacates that sentence and reverses the underlying conviction.

### Conclusion

In sum, we vacate Defendant's judgment of sentence and reverse his convictions for attempted murder and aggravated assault. We affirm his convictions for PIC and carrying a firearm without a license, and remand for resentencing on those convictions.

Judgment of sentence vacated. Convictions of attempted murder and aggravated assault reversed. Convictions otherwise affirmed. Case remanded for resentencing. Jurisdiction relinquished.

Judgment Entered.

*Benjamin D. Kohler*

Benjamin D. Kohler, Esq.
Prothonotary

Date: 1/21/2026